# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JOEL GOMEZ,                                    1:10-cv-00417-AWI-DLB (HC)

               Petitioner,                    FINDINGS AND RECOMMENDATION
                                               REGARDING PETITION FOR WRIT OF
     v.                                        HABEAS CORPUS

                                               [Doc. 1]
KELLY HARRINGTON,

              Respondent.
_____/

     Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## RELEVANT HISTORY[1]

     Following a jury trial in the Tulare County Superior Court, Petitioner was convicted of seven counts of completed and attempted lewd and lascivious acts upon a child under 14 years old (Cal. Penal Code[2], § 288(a)).  In addition, multiple-victim allegations (§ 667.61(b)) and substantial sexual conduct allegations (§ 1203.66(a)(7), (8)) were found true, with minor exceptions.

     On August 31, 2005, Petitioner was sentenced to an aggregate term of forty-seven years to life in prison.

---

[1] This information is derived from the state court records lodged by Respondent on June 3, 2010, and are not subject to dispute.

[2] All further statutory references are to the California Penal Code unless otherwise indicated.

1

1    Petitioner filed a timely notice of appeal.  On October 3, 2008, the California Court of

2  Appeal, Fifth Appellate District, affirmed the conviction.

3    Petitioner filed a Petition For Rehearing with the California Court of Appeals, which was

4  summarily denied on October 22, 2008.

5    Petitioner then filed a Petition For Review in the California Supreme Court, which was

6  summarily denied on January 6, 2009.

7    Petitioner filed the instant Petition For Writ Of Habeas Corpus on March 9, 2010.

8  Respondent filed an answer to the Petition on June 3, 2010.

9                                 STATEMENT OF FACTS[3]

10         [Petitioner] is mildly mentally retarded.  Just after he turned 18 years of
       age in 2001, [Petitioner] sexually molested the two daughters of his mother's
11     boyfriend.  Both of the girls were under 14 years of age.  They reported the events
       to their father, who then reported the matter to the police.
12
           [Petitioner] was charged with 10 counts of lewd and lascivious acts with a
13     child under 14 years of age.  (Pen. Code, § 288, subd. (a).)  The information also
       contained multiple-victim and substantial-sexual-conduct allegations.  (See Pen.
14     Code, §§ 667.61, subd. (b) & 1203.066, subds. (a)(7) & (a)(8).) [Petitioner] was
       convicted as charged on counts one, three, and six through ten, and the
15     enhancement allegations were found true, with minor exceptions.  On counts two,
       four, and five, [Petitioner] was found guilty of attempt as a lesser included
16     offense.

17         [Petitioner] was sentenced to prison for a term of 17 years plus two
       consecutive terms, each 15 years to life. [Petitioner] filed a timely notice of
18     appeal.

19         Other facts directly pertinent to this appeal include the following:

20     A.  The competency proceedings

21         Approximately 20 months after the filing of the original felony complaint,
       defense counsel moved the court for suspension of criminal proceedings and
22     appointment of psychologists to evaluate [Petitioner's] competency to stand trial.
       The court appointed two examiners and suspended criminal proceedings pursuant
23     to Penal Code 1368.  After an additional 18 months, on February 2, 2005, a jury
       trial on [Petitioner's] competency to stand trial began.  Four psychologists
24     testified.  Two said [Petitioner] was incompetent by virtue of his mental
       retardation and two said he was competent to stand trial, notwithstanding his
25     disability.  On February 8, 2005, the jury returned a verdict of competent to stand
       trial.
26

27  ───────────────

28      [3] The Court finds the Court of Appeal correctly summarized the facts in its October 3, 2008 opinion.  Thus,
    the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

                                          2

In August of 2005, defense counsel requested a new hearing on competency.  He said he had just become aware that [Petitioner] was hearing voices and, in response to the instructions by the voices, cutting himself with a razor blade.  Medical records from the jail were submitted showing that [Petitioner] first reported hearing voices and first cut himself in 2003 and that these incidents occurred with some frequency thereafter, continuing at least through August 4, 2005.  A medical report dated nine days before the hearing on the renewed motion stated that [Petitioner] was no longer hearing voices.  Defense counsel also filed a declaration stating that he now believed he had made a mistake by not testifying at the original hearing.  Counsel said he would testify now, and should have testified at the original hearing, that, "in my opinion, there's almost nothing that I can communicate with this young man [Petitioner] that he understands."

The court denied the motion for a further competency hearing.  The court noted that the newly submitted evidence showed the periods of self-destructive behavior included periods during which [Petitioner] had been examined by the psychologist experts, that [Petitioner] had displayed no delusional behavior in court, and that the potential impact of testimony by defense counsel was speculative ("I have no way of knowing whether it would have made a difference or not.")

[Petitioner] filed a petition for writ of mandate in this court.  We denied the petition on the basis that [Petitioner] had "failed to show that his declarations present any significant new facts which could have affected the experts' opinions or the inferences from the facts presented during the prior proceeding regarding the nature of [Petitioner's] understanding of the criminal proceedings. [Petitioner] has failed to explain how the new circumstances indicate that [Petitioner] is now incompetent to stand trial."  (*Joel Gomez v. Superior Court of Tulare County* (Aug. 19, 2005 F048673).)

After [Petitioner] was convicted, counsel moved for a new trial on the basis of the trial court's denial of the motion for a second competency hearing. The new-trial motion was denied.

B.  Motion to exclude [Petitioner's] statement to police

At the criminal trial, [Petitioner] moved to exclude his statement to investigating officers on the basis that he did not validly waive his *Miranda* rights. He argued that the declaration of the psychologist who had seen [Petitioner] at various stages of his life concluded that [Petitioner] had the mental capabilities of a 12-year-old child and that he therefore could not have given a knowing, voluntary, and intelligent waiver of his *Miranda* rights.  The trial court noted that [Petitioner] had been found competent to stand trial and that there was no evidence from which the court could conclude [Petitioner] had been "incompetent" at the time of the police interview.  The court denied [Petitioner's] motion to exclude the statement, and a recording of the statement was played to the jury during the criminal trial.

C.  Composition of the jury

During selection of the jury in the criminal trial, [Petitioner] alleged the prosecutor was using peremptory challenges to remove Hispanic prospective jurors.  Counsel pointed out that four of the five prospective jurors challenged by

3

the prosecutor were Hispanic, as is [Petitioner].  The trial court denied the motion and the renewed motion.  The trial court stated it had "observed [the jury selection] and I'm satisfied that there's been no violation here."  Eight of the 12 members of the seated jury had Hispanic surnames, as did two of the three alternate jurors.

        D.  The "idiocy" instruction

        The jury was instructed with CALJIC No. 4.47 ("Defense of Idiocy"). That instruction tells the jury that, in the law, "[a]n idiot is a person who lacks capacity to commit crime, and therefore is not responsible for what would otherwise be criminal conduct."  As relevant here, the instruction states that the defense is applicable when, as a result of "mental deficiency," the defendant was incapable of "[d]istinguishing right from wrong" at the time of the commission of the alleged crime. [Petitioner] did not request modification of the instruction.  The jury impliedly rejected the defense of idiocy.

(Op. at 2-5.)

DISCUSSION

I.   <u>Jurisdiction</u>

        Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

///

4

II.    Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). "A state court's determination that a claim lacks merits precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

1  and based on a factual determination will not be overturned on factual grounds unless objectively

2  unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

3  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

4  apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v.

5  Blodgett, 393 F.3d 943, 976-77 (2004).

6       Courts further review the last reasoned state court opinion.  See Ylst v. Nunnemaker, 501

7  U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an

8  explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

9  basis for the state court to deny relief."  Richter, 131 S.Ct. at 784.

10  III.   Denial of Second Competency Hearing

11       Petitioner contends the state court erred by failing to conduct a second competency

12  hearing in light of the new and additional evidence which raised doubt on his competency.  In the

13  last reasoned decision, the California Court of Appeal denied the claim stating:

14       It is clear that an incompetent defendant cannot be tried in criminal
proceeding.  (Pen. Code, § 1367, subd. (a); *People v. Dunkle* (2005) 36 Cal.4th

15  861, 885.)  It is also that criminal proceedings must be suspended whenever a
defendant becomes incompetent, even if the defendant previously has been found

16  competent; in other words, the issue of competency addresses the defendant's
current mental state, not the defendant's psychological history.  (See *id*. at p. 895;

17  Pen. Code, § 1368.)

18       Nevertheless, once a jury has determined a defendant is competent to stand
trial, the trial court is required to revisit the issue only if there is substantial new

19  or additional evidence that casts significant doubt on the defendant's present
competence.  (*People v. Medina* (1995) 11 Cal.4th 694, 734.) [Petitioner]

20  contends there was such evidence in the present case and that the trial court erred
in failing to suspend criminal proceedings for a new competency determination.

21  We disagree: There simply was no evidence that [Petitioner's] condition had
deteriorated between the February 2005 determination of mental competence and

22  the July 2005 renewal of the competency question by defense counsel.

23       First, the evidence presented to the court in July of 2005 purported to show
that [Petitioner] now suffered from delusions of voices telling him to harm

24  himself.  In reality, the evidence showed he had suffered these delusions
intermittently since 2003, prior to the interviews with the competency examiners.

25  While the examiners apparently were not aware of this mental health issue at the
time of their evaluations, they based their conclusions in part on [Petitioner's]

26  ability to communicate with them at the interviews.  There was no attempt to
show how the evaluator's knowledge of the delusional episodes would have

27  changed the fact that [Petitioner] communicated with the evaluators in the way he
did.

28

1

2          Nor was there any evidence from counsel that [Petitioner's] delusions
   additionally inhibited his ability to comprehend events and communicate with
3   counsel. (See *People v. Dunkle*, *supra*, 36 Cal.4th at p. 890. [existence of mental
   illness not determinative of competency to stand trial].)  Counsel merely reiterated
4   that "I have always had concerns about his mental capacity and competence."  The
   new evidence did not establish that the delusions inhibited [Petitioner's]
5   communications or cognition in any way. [Petitioner] was aware the voices were
   self-generated, he resisted the voices' instructions to harm himself and his
6   cellmate (although his resistance was not always successful), and he was able to
   communicate with jail staff about the problems.

7          Second, the evidence showed that [Petitioner] was on medication and had
   not experienced delusions the days leading up to the trial.  Accordingly, the new
8   evidence did not raise doubt about [Petitioner's] competency to stand trial.

9          The trial court did not err in denying [Petitioner's] renewed competency
   proceedings.  In addition, the court did not err in denying the motion for new trial,
10  which motion was premised upon the claim that the court should have granted the
   earlier motion to reopen the competency issue.

11

12  (Op. at 5-6.)

13       It is clearly established federal law that an incompetent defendant may not be held to

14  stand trial.  Drope v. Missouri, 420 U.S. 162, 171 (1975); Pate v. Robinson, 383 U.S. 375, 385

15  (1966).  A defendant is incompetent if "he lacks the capacity to understand the nature and object

16  of the proceedings against him, to consult with counsel, and to assist in preparing his defense."

17  Drope, 420 U.S. at 171.  If the evidence raises a bona fide doubt about the defendant's

18  competence, due process requires a full competency hearing to be held, to be ordered sua sponte

19  by the judge.  Pate v. Robinson, 383 U.S. at 385.  Factors to consider in determining a

20  defendant's competence include evidence of irrational behavior, demeanor at trial, and any prior

21  medical opinion on competence.  Drope, 420 U.S. at 180.  Further, a trial judge has a continuing,

22  affirmative responsibility to ensure that a defendant is not tried while incompetent.  Medina v.

23  California, 505 U.S. 437, 449 (1992); Drope, 420 U.S. at 179; Miles v. Stainer, 108 F.3d 1109,

24  1112 (9th Cir. 1997).  The issue is "'whether a reasonable judge . . . should have experienced

25  doubt with respect to competency to stand trial.'"  Hernandez v. Ylst, 930 F.2d 714, 716 (9th Cir.

26  1991).  "The state trial and appellate courts' findings that the evidence did not require a

27  competency hearing under Pate are findings of fact to which [this court] must defer unless they

28  ///

7

are 'unreasonable' within the meaning of 28 U.S.C. § 2254(d)(2)." <u>Torres v. Prunty</u>, 223 F.3d 1103, 1105 (9th Cir. 2000).

A jury trial was conducted to determine Petitioner's competence to stand trial, and on February 8, 2005, Petitioner was found competent.  Petitioner contends that his conduct subsequent to the competency trial created a "bona fide doubt" as to his competence and required the trial court to conduct a further hearing.  Petitioner points to the evidence that he heard voices instructing him to self-mutilate which resulted in lacerations to his body.  Contrary to Petitioner's claim, the evidence before the trial court does not demonstrate that the state appellate court was unreasonable in determining that there was no doubt as to Petitioner's competence to stand trial a second time in August 2005.  First, Petitioner communicated with competency examiners who evaluated his competence for the February 2005 trial and, although the examiners apparently did not know of his alleged delusional self-destructive voices in 2003, there is no showing that their opinion would have changed given such information and any conclusion otherwise is pure speculation.  Moreover, contrary to Petitioner's argument, this case is not analogous to the circumstances present in <u>Drope</u>.  There, Drope's wife testified that Drope along with four other men forcibly raped her.  She resumed living with Drope on the advise of his psychiatrist.  Drope's wife informed Drope's attorney that she believed he needed psychiatric care and told him of instances in which Drope would roll down the stairs when he did not get his way, and Drope tried to kill her prior to the trial.  Drope's wife later testified that she was not certain that he was actually sick.  During the trial, Drope failed to appear in court because he had shot himself in the abdomen.  The Supreme Court found this evidence created a sufficient doubt as to Drope's competence and required further inquiry.

The present case is easily distinguishable from <u>Drope</u>.  First, unlike in <u>Drope</u>, Petitioner received a complete jury trial regarding his competency.  Second, although Petitioner allegedly cut himself in an attempted suicide, the record is not completely supportive of such finding. Petitioner claims to have heard voices telling him to cut, harm, or kill himself, and he threatened to harm himself and/or his cell mate.  (II CT 398, 399, 418-421.)  It is questionable whether single subcutaneous cuts and other lacerations requiring no surgery or hospitalization constitutes

a suicide attempt, unlike shooting oneself in the stomach as in <u>Drope</u>.  Third, unlike in <u>Drope</u>, where the court considered as a major factor that Drope attempted to kill his wife just days before the trial, every report of Petitioner hearing voices, lacerations, or threat of harm was followed by some form of amelioration, i.e., cessation of voices or a no-harm contract.  Indeed, for the three weeks proceeding trial, Petitioner denied hearing voices for three or four days, denied suicidal ideations, had no safety issues, and was taking his medication regularly.  In addition, there were no outbursts in the trial court, and the trial court noted Petitioner appeared oriented.  Moreover, counsel never provided specific details as to what he could not communicate with Petitioner and/or how Petitioner was unable to understand the proceedings, and it appears he ably communicated with defense counsel.  Petitioner was also able to effectively communicate with jail personnel regarding any concerns or needs.

This case is also distinguishable from <u>Pate v. Robinson</u>, 383 U.S. 375 (1966).  There, Pate presented four witnesses who provided testimony regarding his long history of mental behavior and all opined that he was insane.  Robinson's mother was one of the witnesses, who testified that when Robinson was seven or eight years old a brick dropped on his head.  As a result, he was cross-eyed, had headaches, and engaged in erratic behavior.  One witness testified that on one occasion, Robinson, was foaming at the mouth and had lost his mind thinking someone was going to shoot him.  He was hospitalized and the medical reports revealed that he heard voices, saw things, and could possibly be schizophrenic.  There was testimony that Robinson would sometimes look "dazed."  Robinson had also previously shot and killed his son, and attempted to kill himself.  Soon after his release from prison, he continued to become uncontrollably violent engaging in physical fights with individuals, and ultimately murdering the women for whom he was on trial.  The Supreme Court determined that Robinson was entitled to a competency hearing.

In this case, the jury found Petitioner competent to stand trial, and although he suffered from a mild form of mental retardation two experts testified that he was able to appreciate wrong from right, he was able to control his behavior and understand that he should not comply with the voices, and his physical behavior did not escalate and was not uncontrollable.  While Petitioner

1   suffers from a mild form of mental retardation, his circumstances do not demonstrate the level of

2   mental instability present in Pate.  Therefore, the state courts' determination of this claim was not

3   contrary to or an unreasonable application of the controlling federal law; nor was it an

4   unreasonable determination of the facts in light of the evidence before it.  28 U.S.C. § 2254(d).

5   IV.   Miranda Waiver

6          Petitioner claims the state court erred by placing upon the defense the burden of proving

7   that his waiver of his Miranda rights was not knowing, voluntary, and intelligent.  He also claims

8   the trial court improperly relied on the February 2005 competency proceedings as res judicata for

9   the waiver issue, instead of conducting a new hearing.

10         The California Court of Appeal provided the last reasoned decision and rejected the claim

11  stating:

12              First, and the foremost consideration of this issue, is the complete absence
           of any evidence [Petitioner's] waiver of rights after the *Miranda* admonitions was
13         not knowing, voluntary, and intelligent.  By contrast, the transcript of the
           interview shows both the proper admonitions by the police officer and defendant's
14         responses, which are appropriate and demonstrate understanding of the
           admonitions.  Because the transcript is the only evidence on the issue, and because
15         it establishes prima facie a knowing, voluntary, and intelligent waiver, it does not
           matter who had the burden of proof: the only evidence before the trial court
16         supported admitting the statement into evidence.  (See, e.g. *People v. Cruz* (2008)
           44 Cal.4th 636, 668.)
17
                Second, as the prosecutor argued below, the interview was not custodial.
18         Accordingly, there was no requirement for *Miranda* admonitions and no resulting
           requirement for waiver of the enumerated rights.  (*People v. Storm* (2002) 28
19         Cal.4th 1007, 1026-1027.) [Petitioner] did not claim in the trial court that the
           interview was custodial for Miranda purposes, but contended instead that the issue
20         of custody was irrelevant because he did not "knowingly and intelligently waive
           his rights."  While [Petitioner] enumerates the various considerations that make an
21         interview custodial or noncustodial for these purposes, he does not contend there
           is any evidence in the record to show the interview was custodial.  As with the
22         waiver issue, the only evidence before the trial court was the testimony of the
           police officer and the transcript of the interview, which clearly establishes, in the
23         absence of any other evidence, that [Petitioner] was not in custody.

24  (Op. at 7.)

25         An "inculpatory statement made by a defendant during custodial interrogation" must be

26  voluntary, knowing, and intelligent.  United States v. Shi, 525 F.3d 709, 727 (9th Cir. 2008).  "A

27  valid waiver of Miranda rights depends upon the totality of the circumstances including the

28  background, experience, and conduct of defendant."  However, the Miranda rules do not come

                                                       10

into play unless two conditions exist simultaneously: "custody" and "interrogation." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 247 (1973). Absent one of the factors, Miranda is simply not applicable.  <u>Mathis v. United States</u>, 391 U.S. 1, 5 (1968).  "The ultimate inquiry is simply whether there is a formal arrest, or restraint on freedom of movement of the degree associated with formal arrest."  <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).  In general, being detained at a police station, i.e., not being free to leave, will constitute "custody" for <u>Miranda</u> purposes.  <u>Id</u>. at 1123-1125.  However, if a person goes to the police station voluntarily or if a reasonable person similarly situated would believe he is free to leave, "custody" does not exist.  <u>Id</u>. at 1125.

The state appellate court reasonably found that at the time of interview, Petitioner was not in "custody" and <u>Miranda</u> was not applicable.  This finding is supported by the fact that Petitioner went to the police station with his mother, agreed to speak with police alone, and was not in any way restrained.  Therefore, the state court's application of the controlling supreme court precedent was not objectively unreasonable, and the claim must be denied.

With respect to Petitioner's claim that the trial court shifted the burden to the defense to show the waiver was invalid, the appellate court reasonably concluded that in light of the evidence, the issue of who carried the burden of proof was irrelevant.  The evidence before the trial court established a prima facie showing that Petitioner understood and voluntarily waived his <u>Miranda</u> rights, and there was no evidence to the contrary.  Accordingly, viewing the totality of the circumstances surrounding the interrogation, the waiver was knowing and intelligent.  <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1044 (1983).  The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

V.     <u>Instructional Error</u>

Petitioner contends his Sixth and Fourteenth Amendment rights to due process were violated when the trial court instructed the jury with an unfair "idiocy" instruction.  More specifically, he claims the instruction failed to (1) distinguish legal wrong from moral wrong; (2)

instruct the jury that if defendant could not distinguish either legal or moral wrong, he was not

responsible; and (3) moral wrong had to be based on generally accepted standards of moral

obligations, not defendant's subjective peculiar standards.

The California Court of Appeal rejected the claim based on the following:

> [Petitioner] contends the trial court erred in instructing the jury with an unmodified version of CALJIC No. 4.47 as it existed at the time of trial.  That instruction excuses otherwise criminal conduct if, among other reasons, a person suffers from mental deficiency to such an extent he or she is incapable of distinguishing "right from wrong."  (See CALJIC No. 4.47 (Oct. 2005 ed.).)

> In 2006, the instruction was changed to reflect similar changes in the instruction on the insanity defense, CALJIC No. 4.00 (See com. to CALJIC No. 4.47 (Fall 2007-2008 ed.) p. 189.)  The changes in CALJIC No. 4.00 were made in response to *People v. Torres* (2005) 127 Cal.App.4th 1391.

> In that case the jury was instructed that a defendant is insane if, by reason of mental disease or defect, he was incapable of distinguishing "'right from wrong at the time of the commission of the crime.'" (*People v. Torres*, *supra*, 127 Cal.App.4th at p. 1400.)  The trial court modified the instruction, however, adding: "'The term "wrong" refers to both legal wrong and moral wrong.  The concept of moral wrong refers to society's generally accepted standards, and not to the subjective standards of the defendant.'"  (See *ibid*., italics omitted.)

> The Court of Appeal concluded that a defendant does not have to prove an inability to distinguish both legal and moral right from wrong; inability to distinguish moral right and wrong is sufficient. (*People v. Torres*, *supra*, 127 Cal.App.4th at p. 1402.)  The instructional error was prejudicial in Torres because there was evidence that, even though he knew killing was illegal and he would be arrested, defendant thought killing the intended victims was justified because he was stopping a greater evil.  (*Id*. at p. 1399.)  Because the evidence would permit a jury to determine that defendant could not distinguish moral right from wrong, the instruction was prejudicial.  (*Id*. at p. 1402.)

> There are two points to be made about Torres.  First, the case did not hold that either CALJIC No. 4.00 (or its analog here, 4.47) was in any way defective.  It was the trial court's modification of the instruction to introduce a requirement of incapacity to recognize both legal and moral wrong that was in issue.  Second, the error in that case was prejudicial only because of the unique fact that some of defendant's experts said he did not recognize the moral wrongness of his acts because of his delusions, even though he recognized their legal wrongfulness.

> In the present case, [Petitioner] does not cite any authority for the proposition that the jury must be instructed on separate concepts of legal and moral wrong.  The instruction in the present case did not limit the jury's consideration to "legal right and wrong," nor did it require a separate finding concerning legal and moral right and wrong.

> Further, the evidence does not provide a basis, as it did in Torres, to conclude [Petitioner] could not distinguish between moral right and wrong even though he was able to distinguish between legal right and wrong; when asked in his interview if he knew it was wrong to touch the girls, [Petitioner] said he knew

it was wrong because they "were little." In other words, [Petitioner] offered no moral justification for his acts, whether delusional or otherwise.

The instruction as given in this case was not erroneous and even if, for purposes of argument, the instruction should have distinguished between legal and moral wrong, any error was not prejudicial.

(Op. at 8-10.)

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Id.

As an initial matter, the state appellate court disagreed with Petitioner's interpretation of state law, and rejected his claim that the instruction should have distinguished legal and moral wrong under state law. The Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005). This Court is bound by the state court's interpretation of its own law, and Petitioner is simply asking this

Court to second-guess its finding.  See Waddington v. Sarausad, 129 S.Ct. 823, 832 n.5 (2009)

("we have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-

court determination on state-law questions").

In any event, there is no showing the instruction rises to the level of a due process

violation.  There was simply no evidence to support a moral justification for Petitioner's

touching of the girls.  Petitioner specifically told police that he knew it was wrong to touch the

girls because they "were little."  Thus, there is simply no showing that the giving of this

instruction-violated Petitioner's due process rights.

VI.    Equal Protection Violation

Petitioner contends the court erred in finding that no prima facie case of racial

discrimination during jury selection had been established.  In finding no merit to the claim, the

California Court of Appeal ruled as follows:

> [Petitioner] contends the trial court erred by deferring the inquiry into the
> prosecutor's exercise of peremptory challenges to potential jurors.  The trial court,
> according to [Petitioner], determined that [Petitioner] had not established a prima
> facie case that the prosecutor excluded jurors, reasoning that [Petitioner] was
> merely speculating whether Hispanic-surnamed individuals were, in fact,
> Hispanic.
>
> While the trial court did engage counsel in a generalized discussion of
> what might constitute a Hispanic juror for these purposes, it also stated it had
> "observed" the jury selection and that "there's been no violation here."  When we
> review the voir dire transcript, the basis for the court's statement is readily
> apparent: Of the four excused jurors, three presented a strong potential for
> sympathy for the developmentally disabled defendant.  One was a school
> psychologist, one was a special education aide who had worked for six years with
> male developmentally disabled clients (she said, "And my heart goes out to
> them"), and the developmentally disabled nephew of the third was in prison for a
> similar crime.  Further, the prosecutor's fifth peremptory challenge was to a non-
> Hispanic who said her developmentally disabled cousin did not really have control
> over his occasional violent conduct and that the cousin did not "really realize[]
> what he was doing."  The fourth excused Hispanic juror displayed a limited
> ability to communicate in English.
>
> On this record, the trial court correctly concluded that simply counting the
> numbers of excused Hispanic jurors did not result in a prima facie case that the
> prosecutor had exercised peremptory challenges on the basis of jurors' race or
> ethnicity.  (See *People v. Bonilla* (2007) 41 Cal.4th 313, 342.)

(Op. at 7-8.)

///

In <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986), the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. <u>Purkett v. Elem</u>, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995). First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. <u>Id</u>. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. <u>Id</u>.

> [A] court must consider the 'totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike. Thus, when a defendant raises a plausible *Batson* claim, a court must analyze the context in which the contested peremptory strike arose.

<u>Boyd v. Newland</u>, 467 F.3d 1139, 1146-1147 (9th Cir. 2006) (citations omitted). The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. <u>Purkett v. Elem</u>, 514 U.S. at 769. Likewise, the state appellate court's findings of fact are entitled to the same presumption. <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1050 (9th Cir. 2004); <u>Williams v. Rhoades</u>, 354 F.3d 1101, 1008 (9th Cir. 2004). Therefore, Petitioner must demonstrate that the state court's conclusion was "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." <u>Id</u>. (citing 28 U.S.C. § 2254(d)(2). Thus, this Court can only grant habeas corpus relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006).

A prima facie case of discrimination may be based on statistical disparity. <u>United States v. Collins</u>, 551 F.3d 914, 921 (9th Cir. 2009) ("We have found an inference of discrimination where the prosecution strikes a large number of panel members from the same racial group, or where the prosecutor uses a disproportionate number of strikes against members of a single racial group." (citation omitted). However, a prima facie showing based on statistically disparity may be dispelled by other relevant circumstances during the voir dire process. <u>Id</u>. In addition, to make the prima facie showing, the Court considers the differing treatment of similarly situated prospective jurors. <u>Id</u>. at 921-922.

In this instance, after applying the proper standard of review,[4] the state appellate court reasonably concluded that Petitioner failed to demonstrate a prima facie showing of discrimination.  The trial court made note three of the four excused jurors "presented a strong potential for sympathy for the developmentally disabled defendant."  (Op. at 8.)  In addition, the fourth juror lacked sufficient English speaking ability, an obvious race-neutral reason for excusing him/her.  The Court of Appeal emphasized that the numerical statistics did not raise an inference of purposeful discrimination.  Moreover, the record does not contain evidence from which this Court can attempt to assess the ethnic composition of the venire.  Some of the jurors were referenced by juror number only, some by name only, and others interchangeably.  However, the record demonstrates that during different points of jury selection, the prosecutor accepted respective jury panels containing traditional Hispanic surnames.  Although the prosecutor exercised four of its six peremptory challenges against Hispanic jurors, the trial court pointed out eight of the twelve members of the final jury panel had traditional Hispanic surnames, and one or two of the three alternates also had Hispanic surnames.  In addition, two of the six peremptory challenges were to non-Hispanic jurors.  The prosecution exercised a peremptory challenge to a comparative non-Hispanic juror who had a developmentally disabled cousin.  The prosecutor asked the same questions of minority and non-minority prospective jurors, and engaged in meaningful questioning of all potential jurors.  See Miller-El v. Dretke,

---

[4] The state appellate court cited to People v. Bonilla, 41 Cal.4th 313, 342 (2007), which held the following:

Ordinarily, we review the trial court's denial of a *Wheeler/Batson* motion deferentially, considering only whether substantial evidence supports its conclusions.  (*People v. Avila*, *supra*, 38 Cal.4th at p. 541, 43 Cal.Rptr.3d 1, 133 P.3d 1076.)  However, the United States Supreme Court recently concluded that California courts had been applying too rigorous a standard in deciding whether defendants had made out a prima facie case of discrimination.  (See *Johnson v. California*, *supra*, 545 U.S. at pp. 166-168, 125 S.Ct. 2410 [holding the requirement a defendant show a "strong likelihood," rather than a "reasonable inference," of discrimination was inconsistent with *Batson* and the federal Constitution].)  In cases where the trial court found no prima facie case had been established, but whether it applied the correct "reasonable inference" standard is unclear, "we review the record independently to 'apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror' on a prohibited discriminatory basis." [citations]

People v. Bonilla, 41 Cal.4th at 341-342. (Emphasis in original.)

545 U.S. 231, 263 (2005); <u>Fernandez v. Roe</u>, 286 F.3d 1073, 1079 (9th Cir. 2002).  Furthermore,

Petitioner fails to present any additional evidence giving rise to such an inference of

discrimination.  Thus, the record lacks any statistical disparity in light of the totality of the

relevant circumstances to raise in inference of discriminatory purpose.  <u>See</u> <u>Gonzalez v. Brown</u>,

585 F.3d 1202, 1211 (9th Cir. 2009) (holding that the fact that African-American jurors remain

on the panel "may be considered indicative of nondiscriminatory motive.")  Based on these

circumstances, the Court of Appeal's decision was not an unreasonable application of federal

law, nor an unreasonable determination of the facts in light of the evidence.  28 U.S.C. §

2254(d).

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus be DENIED; and

2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District

Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with

the court and serve a copy on all parties.  Such a document should be captioned "Objections to

Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served

and filed within fourteen (14) days after service of the objections.  The Court will then review the

Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that

failure to file objections within the specified time may waive the right to appeal the District

Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

 **Dated:** __**April 6, 2011**__          _____**/s/ Dennis L. Beck**_____
                                                    UNITED STATES MAGISTRATE JUDGE